IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Craig B. Shaffer

Civil Action No. 13-cv-01896-CBS

KENNETH G. VIGIL,

        Plaintiff,

v.

CAROLYN W. COLVIN,

        Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Shaffer

      This action comes before the court pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 and 1381-83(c) for review of the Commissioner of Social Security's final decision denying Plaintiff, Kenneth G. Vigil's, application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to the Order of Reference dated March 6, 2014, this civil action was referred to the Magistrate Judge "for all purposes" pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c). (*See* Doc. #22). The court has carefully considered the Complaint (filed July 17, 2013) (doc #1), Defendant's Answer (filed October 18, 2013) (doc. #10), Plaintiff's Opening Brief (filed December 2, 2013) (doc. #14), Defendant's Response Brief (filed February 18, 2014) (doc. #17), Plaintiff's Reply Brief (filed March

3, 2014) (doc. 18), the entire case file, the administrative record, and applicable case law.  For the following reasons, I affirm the Commissioner's decision.

## PROCEDURAL HISTORY

On June 28, 2010, Kenneth Vigil filed an application for DIB under Title II of the Act and an application for SSI under XVI of the Act.  (*See* Record (Doc. #11-2) at 11; (Doc. #11-5) at 6 of 17).  Mr. Vigil has a Tenth Grade education and has tried without success to obtain his GED.  (*See* Record (Doc. #11-11) at 47 of 100).  His professional work experience consists exclusively of jobs involving manual labor, such as a fiberglass maker, spot welder, brick maker, and hog farmer.  (*See* Record (Doc. #11-2) at 38 of 41).  Plaintiff alleges he became disabled on July 28, 2006 at the age of 42 due to injuries sustained to his left knee and ankle while at work.  The claim was denied at the initial determination stage on October 4, 2010, and Plaintiff requested a hearing. (*See* Record (Doc. #11-2) at 11).  Administrative Law Judge William Musseman ("ALJ") held a hearing on February 28, 2012, at which Plaintiff was represented by counsel and testified that he could not work due to knee and back problems and poor stability, all of which prevent him from standing longer than fifteen minutes or lifting more than twenty pounds.  Mr. Vigil further testified that he takes medication and has tried physical therapy but nonetheless struggles with bending, lifting, and squatting.  Finally, Plaintiff testified that he suffers from depression and anxiety, is uncomfortable leaving his house, and is easily distracted.  Nora W. Dunne testified as a vocational expert ("VE"). The ALJ posed three hypothetical scenarios to the VE.  First, he questioned whether jobs exist for a person of Plaintiff's age with Plaintiff's education, who is limited to an exertional level in a full range of light; with only occasional bending, squatting, and

kneeling; who cannot use ladders or scaffolds; who can only occasionally use foot or leg controls; who cannot perform complex tasks, defined as specific vocational preparation "svp" 2 or less; and who cannot deal with the general public.  (*See* Record (Doc. #11-2) at 39 of 41).  The VE testified that an individual with those limitations could not perform the work involved in Plaintiff's previous jobs, but that jobs compatible with such limitations exist in the national economy.  *See id.*  The VE listed housekeeper, retail marker, and poultry boner as examples.  *See id.*  The ALJ posed a second hypothetical in which he changed the requirement of light to that of sedentary and added a sit/stand option.  *See id.* at 40 of 41.  In the third hypothetical he added a limitation that the person would be off task at least 75 percent of the normal workday.  *See id.*  The VE testified that no jobs exist in the national economy that would be compatible with the limitations described in either hypothetical two or three.  *See id.*  The ALJ issued his written decision on March 9, 2012, concluding that Mr. Vigil was not disabled.

Plaintiff requested review of the ALJ's decision, which the Appeals Council denied on May 22, 2013.  (Record (Doc. #11-2) at 2).  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nelson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Plaintiff filed this action on July 17, 2013.  The court has jurisdiction to review the final decision of the Commissioner.  42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632

(10th Cir. 1996) (citation omitted); *Angel v. Barnhart,* 329 F.3d 1208, 1209 (10th Cir. 2003).   The court may not reverse an ALJ simply because he may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in his decision.   *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).   "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted).   Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted).   The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted).   Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."   *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### A.   Mr. Vigil's Challenge to ALJ's Decision

An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act.   42 U.S.C. §§ 416(i), 423(a)(1).   Supplemental Security Income is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act.   42 U.S.C. § 1382.   An individual is determined to be

under a disability only if his "physical or mental impairment or impairments are of such severity that [he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.* at 750. At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity (RFC) and compare the RFC to the claimant's past relevant work. The RFC is what a claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751. "The claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's

physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .

If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.

…

Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain….

*Williams*, 844 F.2d at 751-52.

The ALJ first determined that Plaintiff was insured for disability through September 30, 2010.   Next, following the five-step evaluation process, the ALJ determined that Mr. Vigil: (1) had not engaged in substantial gainful activity since July 8, 2006; (2) has severe impairments of "degenerative changes of the lumbar spine, status post-left knee anterior cruciate ligament repair, obesity, major depressive disorder, and generalized anxiety disorder"; and (3) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).   At step four, the ALJ found that Plaintiff has the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), cannot perform past relevant work, but, in accordance with step five, is capable of making a successful adjustment to other work in the national economy.   (*See* Record (Doc. #11-2) at 11-21).

Mr. Vigil objects to the ALJ's decision on four grounds: (1) the ALJ failed to support his RFC finding with substantial evidence in the record; (2) the ALJ failed to adequately evaluate and weigh the opinions of the treating, examining, and non-examining physicians; (3) the ALJ failed to adequately develop the record on the issues of disability and restrictions; and (4) the ALJ failed to properly assess the credibility of Plaintiff's testimony.  (*See* doc. #1 at 2).

**B.     ALJ's Assessment of Plaintiff's Physical Impairments**

The ALJ found that Mr. Vigil has an RFC to perform light work, except that he "can only occasionally bend, squat, and kneel; is unable to climb ropes, ladders, or scaffolds; can occasionally operate foot or leg controls; is unable to perform complex tasks, such that he is limited to jobs with svp of 1 or 2; and cannot deal with the general public." (*See* Record (doc. #11-2) at 11-21).  RFC determinations are for the ALJ to make "based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints."  *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009).  *See also* 20 C.F.R. § 416.946 (providing ALJ is responsible for assessing residual functional capacity).   In reaching his RFC finding, the ALJ summarized the exam results for Mr. Vigil's left knee and lumbar spine, reviewed the treatment for his knee and back pain, and weighed the opinions of several physicians. Mr. Vigil objects that the ALJ's RFC finding is not supported in the record and that the ALJ imposed his interpretation of the medical data over that of consultative examiner Dr. Adam Summerlin.

1.     <u>ALJ's RFC Finding as to Plaintiff's Physical Impairments</u>

Plaintiff injured his left knee in July 2006 while at work (*See* Record (Doc. #11-7) at 20 of 77), but ceased working in December 2006 for reasons unrelated to his health. (*See* Record (Doc. #11-6) at 15 of 57).   Initial examinations following the injury showed a left-sided limp and decreased strength and range of motion with no laxity.   (*See* Record (Doc. #11-7) at 8, 9, 64, 65 of 77).   Within a month, Plaintiff had recovered full range of motion, was carrying up to twenty pounds, pushing and pulling 100 pounds, was working twelve-hour shifts, and "doing a lot of walking." (Record (Doc. #11-7) at 4, 5, 6, 63 of 77; (Doc. #11-10) at 6 of 90).   He was restricted to no crawling, kneeling squatting, or climbing (*see* Record (Doc. #11-7) at 63 of 77), though these restrictions were reduced by September 21, 2006.  *Id.* at 69 of 77.   October 2006 exams revealed a normal low back and left leg and no evidence of low back radiculopathy or large fiber peripheral neuropathy.  (*See* Record (Doc. #11-7) at 25-26 of 77).   Plaintiff continued to seek routine care for his knee and lower back during early 2007, and was restricted to carrying no more than twenty pounds.  (*See* Record (Doc. #11-7) at 36-37, 38, 40-41, 42, 43-44, 45, 48 of 77).

In February 2007, x-rays of Plaintiff's left ankle showed an old toe fracture and a heel spur (*See* Record (Doc. #11-7) at 51 of 77), and an MRI of his left knee showed an anterior cruciate ligament (ACL) tear.[1]  *See id.* at 50 of 77.   Orthopedic surgeon Ronald Royce, D.O. surgically repaired the tear on May 17, 2007.  (*See* Record (Doc. #11-8) at 6-8 of 17).   Plaintiff was then prescribed physical therapy and medications.  (*See* Record (Doc. #11-9) at 46, 2-20 of 47; (Doc. #11-10) at 10-11, 13-16, 81-82 of 90).  In

---

[1] The ALJ found that Plaintiff had "not sought any significant ongoing treatment for his left ankle and foot pain, [and] did [not] allege it limited his ability to perform basic work activities," therefore the ALJ find it was a non-severe impairment. (Record (Doc. #11-2) at 14 of 41).

the several months following Plaintiff's surgery, his physical therapists noted that he had progressed well, no longer needed a crutch, and had some limitations with range of motion that should improve with continued therapy.  (Record (Doc. #11-7) at 54 of 77; (Doc. #11-9) at 2, 3, 20 of 47).  Plaintiff was incarcerated in the fall of 2007 and did not resume treatment for his knee until 2010.  (*See* Record (Doc. #11-9) at 30 of 47).

Plaintiff saw Dr. Summerlin in August 2010, shortly after he submitted his DBI and SSI claims.  Dr. Summerlin observed that Plaintiff limped, had some muscle spasms in his back, mild swelling in his left ankle possibly caused by joint fluid, and some decreased sensation in his left calf, but walked without an assistive device, moved on and off the examination table without difficulty, and tested negative for nerve root irritation in his lower back.  Plaintiff exhibited full strength, intact deep tendon reflexes, and no atrophy.  (*See* Record (Doc. #11-9) at 30-33 of 47).  An x-ray of Plaintiff's left knee showed some mild osteoarthritis. *See id.* at 35 of 47.  A subsequent x-ray of Plaintiff's lower back showed moderate degenerative changes with mild scoliosis.  *See id.* at 40 of 47.  Dr. Summerlin opined that Plaintiff's physical impairments prevented him from lifting more than twenty pounds, limited his ability to stoop, crouch, kneel, and crawl, and restricted him from standing or walking more than four hours a day.  (*See* Record (Doc. #11-9) at 32-33 of 47).

In December 2010, Plaintiff began seeing providers at Southern Colorado Family Medicine ("SCFM") following a visit to the facility's emergency room precipitated by kidney stones.  (*See* Record (Doc. #11-10) at 34-37 of 90).  During these visits, Plaintiff demonstrated reduced range of motion in his knee, but was observed as having a normal gait, normal stability, normal lower extremities, no crepitus, and no pain during

the examination.  (*See* Record (Doc. #11-10) at 27-33 of 90.)  One provider noted that

Plaintiff had "not…seen a physician on a regular basis for the past several years and is

applying for disability."  (Record (Doc. #11-10) at 27 of 90).  Another provider informed

Plaintiff that he would not "do lawyer paperwork" for disability.  (Record (Doc. #11-10) at

33 of 90).  A January 2011 MRI of Plaintiff's low back showed no evidence of spinal

stenosis.  Nonetheless, later that month Plaintiff complained to Lee Fonseca, a nurse

practitioner at Parkview Medical Center, that he could not work due to back pain.  Mr.

Fonseca observed that Plaintiff had slightly diminished low back mobility and some

tenderness, but had retained a normal gait and, again, tested negative for nerve root

irritation in his lower back.  (*See* Record (Doc. #11-10) at 2 of 90).  Mr. Fonseca refused

to sign a disability form on the basis that Plaintiff "has absolutely no evidence of

clinically significant central or neural foraminal stenosis, his nuero[logical] exam is

completely stable."  (Record (Doc. #11-10) at 3 of 90).  He recommended that Plaintiff

lose weight, stop smoking, and take anti-inflammatory medication, and instructed

Plaintiff that a follow-up appointment was unnecessary unless his condition worsened.[2]

*See id*.

In the following months, Plaintiff saw several other physicians.  In February 2011,

Elaine Russin, MD at SCFM observed that Plaintiff appeared comfortable, favored his

left leg slightly when walking, and had some tenderness and diminished reflexes of the

legs, but had normal strength, normal tone, and normal stability.  Dr. Russin prescribed

medication and recommended water therapy and stretching.  (*See* Record (Doc. #11-

---

[2] Plaintiff argues that Mr. Fonseca is not an acceptable medical source (*see* 20 C.F.R. § 404.1513(a)), and his opinion should not qualify for greater weight than that of Dr. Summerlin.  (*See* Doc. #18 at 5). However, Mr. Fonseca's findings were but only one source of credible evidence the ALJ considered in determining that Dr. Summerlin's opinion was not consistent with Plaintiff's medical history.

10) at 23-26 of 90).  In April 2011, Jeremy Brown, MD at SCFM observed that Plaintiff had some decreased range of motion and tenderness of his back, full passive range of motion and decreased active range of motion of his left leg, and normal leg stability, strength, and tone.  Dr. Brown recommended stretches for muscle spasms, osteopathic manipulative therapy, and weight loss.  (*See* Record (Doc. #11-11) at 90-92 of 100).  Plaintiff received steroid injections in his back and knee during this time.  (*See* Record (Doc. #11-10) at 18, 60-61 of 90; (Doc. #11-11) at 36, 87-89 of 100).

Plaintiff returned to SCFM in June 2011 after falling; no changes in Plaintiff's knee or back were observed.  (*See* Record (Doc. #11-11) at 38, 84-86 of 100).  The following month, Plaintiff visited Dr. Brown requesting a surgical evaluation for his knee. The subsequent MRI showed evidence of the ACL surgery, intact tendons, minimal effusion, and a normal meniscus.  (*See* Record (Doc. #11-11) at 35 of 100).  In August 2011, Plaintiff told an SCFM provider that a back injection had offered only temporary relief, but denied any radiating pain or altered sensation, and the provider noted that an MRI of Plaintiff's lower back was normal.  Plaintiff appeared comfortable at that time with full extremity strength and displayed no signs of radiculopathy.  The provider recommended water therapy and medication.  (*See* Record (Doc. #11-11) at 78-80 of 100).  In September 2011, Dr. Brown noted some crepitus of the knee and decreased range of motion in Plaintiff's back, but observed normal lower extremity range of motion, stability, strength, and muscle tone.   He recommended osteopathic manipulative therapy and another left knee MRI, which showed an intact graft from the ACL surgery and a small amount of joint fluid.  (*See* Record (Doc. #11-11) at 29, 75-77 of 100).  One month later, a different SCFM physician observed that Plaintiff had some crepitus in his

left knee, increased laxity with inward pressure, decreased muscle tone of some knee muscles, and back spasms with reduced range of motion, but appeared comfortable. This physician recommended continued conservative treatment and that Plaintiff quit smoking. (*See* Record (Doc. #11-11) 72-74 of 100).  Plaintiff was observed as having a normal gait, strength, tone, and stability in November 2011 and January 2012.  (*See* Record (Doc. #11-11) at 65-71, 96-98 of 100).

The ALJ also noted that Plaintiff was experiencing very little pain prior to his incarceration in 2008, and had met many of his physical therapy goals.  Plaintiff did not receive treatment while in prison, despite the availability of such services free of charge, and began seeing providers regularly in December 2010 after his release.[3]

After reviewing the record, the ALJ determined that Plaintiff was limited in his ability to lift, carry, or engage in infrequent bending, kneeling, or squatting, but that the limitations on walking and standing were not supported.  The ALJ's summary of Plaintiff's medical records and treatment demonstrates his consideration of the relevant medical evidence (*see* Record (Doc. #11-2) at 5-8 of 41).

### 2.   Weight Attributed to Dr. Summerlin's Opinion

An ALJ may reject medical opinions in the record and reach his own conclusion as to a claimant's RFC, so long as that conclusion is based on substantial evidence. *See Boss v. Barnhart*, 67 Fed. Appx. 539, 542 (10th Cir. 2003); *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (ALJ may resolve conflicting medical evidence); *cf. Moon v. Barnhart*, 159 F. Appx. 20, 22–23 (10th Cir. 2005) (finding an RFC

---

[3] "While [Plaintiff] has sought significantly more treatment in 2011, it is unclear why he suddenly needs this intensive level of treatment when he was previously without treatment of any kind for almost 3 years and his objective studies reveal no significant changes in his conditions."  (Record (Doc. #11-2) at 7-18 of 41).

assessment was not based on substantial evidence where ALJ adopted an opinion that tempered two physicians' medical opinions without explaining what credible evidence he used to reject the doctors' opinions or what evidence supported his RFC).   In evaluating medical opinions, the ALJ should consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

20 C.F.R. § 404.1527; *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

Dr. Summerlin was not a treating physician and therefore his opinion was not entitled to more weight.   *See* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources[.]").   Instead, the ALJ considered Dr. Summerlin to be a consultative examiner because he saw Plaintiff once in August 2010. (*See* Record (Doc. #11-2) at 19 of 41); (Doc. #11-9 at 30 of 47).   The ALJ noted the doctor's observations that Plaintiff demonstrated normal range of motion of the knee, normal gait, and normal strength and tone, as well as his findings of some mild osteoarthritis in Plaintiff's left knee and moderate degenerative changes in Plaintiff's lower back with mild scoliosis, as evidenced by x-rays.  (*See* Record (Doc. #11-2) at 16-17, 19 of 41; (Doc. #11-9) at 31-33 of 47).   The ALJ then weighed Dr. Summerlin's diagnosis of lumbrosacral radiculopathy and osteoarthritis of the left knee against the opinions, diagnoses, and recommendations of the other physicians and providers who had treated Plaintiff.   *See* 20 C.F.R. § 404.1527(c) (the ALJ must consider every

medical opinion, regardless of its source). Dr. Summerlin is the only provider of at least seven between August 2006 and January 2012 who diagnosed Plaintiff with radiculopathy. Indeed, Plaintiff's October 2006 exams specifically showed a normal low back and left leg with no evidence of low back radiculopathy or large fiber peripheral neuropathy; and in August 2011, an SCFM provider observed that Plaintiff had a normal back with no signs of radiculopathy following the administration of an MRI. While the range of motion in Plaintiff's knee and back fluctuated during his approximately three-year history of medical treatment and he developed some crepitus and joint fluid, he maintained normal gait, strength, and tone, remained free from nerve root irritation and stenosis, and was routinely described as "comfortable" by providers.

Contrary to Plaintiff's argument, the ALJ did not substitute his judgment for that of Dr. Summerlin. Nor did the ALJ neglect to consider Dr. Summerlin's abnormal findings. The ALJ considered the record as a whole and found that Dr. Summerlin's opinion was inconsistent with Plaintiff's medical history and treatment. The ALJ additionally found that the doctor's failure to "reconcile the apparent discrepancy between [ ] essentially normal findings and his opinion" detracted from the persuasiveness of his opinion. (Record (Doc. #11-2) at 19 of 41). *See White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2001) (court's rejection of a treating physician's opinion was appropriate where limited examinations did not support a restrictive functional assessment, the opinion was inconsistent with the findings of consulting physicians, and the treatment relationship was relatively brief); *see also Oldham*, 509 F.3d at 1258 (holding ALJ's citation to "contrary, well-supported medical evidence" in the record satisfies the requirement that the ALJ's decision be "'sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the [medical opinion] and the reasons for that weight.'") (citation omitted).

## C.   ALJ's   Assessment   and   Instruction   Regarding   Plaintiff's   Mental Impairments

The ALJ found that Mr. Vigil has severe mental impairments of major depressive disorder and generalized anxiety disorder.  (*See* Record (Doc. #11-2) at 13 of 41).  The ALJ further found that Plaintiff has moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no restriction in activities of daily living.  *See id.* at 14 of 41.  To reach these conclusions, the ALJ summarized the results of Plaintiff's mental status exams, reviewed the treatment Plaintiff received for his depression and anxiety, and weighed the opinions of psychologist Carlos Rodriguez, PhD and psychoanalyst Mark Jankelow.  The ALJ attributed little weight to Dr. Rodriguez's opinion that Plaintiff could not work for twelve months due to his mental and physical impairments.[4]  The ALJ gave no weight to Mr. Jankelow's opinion that Plaintiff had "marked and extreme limitations in every area of mental and emotional functioning," would not be able to participate in full-time work, and is incapable of staying on task for 75 percent of the time.  (*See* Record (Doc. #11-2) at 19 of 41); (Doc. #11-11) at 93-95 of 100).  Mr. Vigil objects that the ALJ should have

---

[4] On July 18, 2011, Plaintiff saw Dr. Rodriguez, who completed a standardized Colorado Department of Human Services "Med-9 Form" stating that Plaintiff was unable to work for twelve consecutive months due to depression, anxiety, and complications with his left heel. (*See* Record (Doc. #11-10) at 75 of 90). Dr. Rodriguez was the only acceptable medical source who saw Plaintiff for mental health complaints. *See* 20 C.F.R. § 404.1513 (defining medical source).  The ALJ attributed little weight to Dr. Rodriguez's opinion, however, finding that it was not supported by explanation, exam findings, treatment history, or any other evidence. *See Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012) (holding the ALJ "properly gave no weight to the 'Med-9 Form,' which lacked any functional findings.").  The ALJ further noted that Dr. Rodriguez saw Mr. Vigil only once, and therefore lacked the relationship that would have provided insight into Plaintiff's ability to function over a twelve-month period.  Plaintiff does not object to the ALJ's designation of little weight to Dr. Rodriguez's opinion (*see* Doc. #1 and #14), therefore the court will consider the designation undisputed.

granted Mr. Jankelow's uncontroverted medical opinion more weight, and that the ALJ's rejection of Mr. Jankelow's restrictions resulted in an inaccurate assessment of the severity of Plaintiff's mental impairments.    Mr. Vigil further objects that the ALJ improperly found that Plaintiff has no limitations in dealing with coworkers or supervisors, and did not account for Plaintiff's concentration and memory deficits in his instructions to the VE.

Plaintiff did not allege a mental impairment on his application for benefits.  (*See* Record (Doc. #11-6) at 15, 23, 42 of 57).   He first sought treatment for anxiety and depression in September 2011 following his release from prison.  (*See* Record (Doc. #11-11) at 57, 59 of 100).   In October 2011, Plaintiff saw Mr. Jankelow, who observed that Plaintiff appeared to have a dysthemic mood and affect, fair to poor insight, moderate stress level, and below average intellect, though was alert and oriented, maintained appropriate eye contact, and had normal speech, thought processes, and thought content.   Mr. Jankelow diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder, and assessed a Global Assessment of Functioning ("GAF") score of 58.  (*See* Record (Doc. #11-11) at 45-50 of 100).   In November 2011, Plaintiff returned to Mr. Jankelow who noted that Plaintiff had a lower stress level and otherwise appeared unchanged.  (*See* Record (Doc. #11-11) at 40-43 of 100).   Following a final visit in January 2012, Mr. Jankelow opined that Plaintiff had marked and extreme mental limitations in every area of work-related mental functioning.  (*See* Record (Doc. #11-11) at 93-95 of 100).

Plaintiff also underwent several mental status exams in 2011.   One exam from September 2011 indicated no problems with Plaintiff's recent or remote memory (*See*

Record (Doc. #11-11) at 62 of 100); while Mr. Jankelow determined in October 2011 that Plaintiff could recall only one out of three items on delayed recall, was unable to spell "world" in reverse, and could not name the current or former President of the United States. (*See* Record (Doc. #11-11) at 48 of 100).  However, Plaintiff could spell "world" forward and remember three out of three items on immediate recall.  *See id.* Furthermore, all the exams showed that Plaintiff had normal thought processes and normal thought content.  (*See id.*; Record (Doc. #11-11) at 41, 47, 62 of 100).  Finally, Plaintiff's GAF scores ranged from 58-61, indicating moderate to mild symptoms.  (*See* Record (Doc. #11-2) at 18 of 41 (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 1994)); (Doc. #11-11) at 41, 49, 63 of 100).[5]

> 1.    Weight Attributed to Mr. Jankelow's Opinion

The ALJ did not err in attributing no weight to Mr. Jankelow's opinion.  First, he found that Mr. Jankelow is not an acceptable medical source because his is not a physician.   Second, Mr. Jankelow did not have the treatment history with Plaintiff necessary for him to predict Plaintiff's twelve-month trajectory because he treated Plaintiff on only a few occasions.  *See* 20 C.F.R. § 404.1527(d) (explaining how agency weighs medical source opinions). Third, the ALJ found that Mr. Jankelow's opinion of marked and extreme impairments suggested that Plaintiff suffers from limitations that would require repeated if not chronic psychiatric hospitalization, yet Plaintiff had never been hospitalized in a psychiatric facility and had no previous treatment of a psychiatric nature.  (*See* Record (Doc. #11-11) at 46 of 100).  Indeed, while initial exams showed

---

[5] The ALJ may consider a claimant's GAF score as evidence along with the rest of the record. *See Petree v. Astrue,* 260 Fed. Appx. 33, 42 (10th Cir. 2007).

that Plaintiff had a "depressed mood and blunt affect," his last mental status exam found his mood to be "euphoric"[6] and his affect unremarkable.   (Record (Doc. #11-11) at 41, 62 of 100).    The ALJ found these results to indicate that Plaintiff's medications and therapy "have been effective in alleviating his depression and anxiety."   (Record (Doc. #11-2) at 18 of 41.   Finally, the ALJ determined that Mr. Jankelow's opinion was not supported by the "fairly benign mental status exam findings" and Plaintiff's "fairly routine treatment history."   (Record (Doc. #11-2) at 20 of 41).   Accordingly, the ALJ discussed "specific, legitimate reasons" for his assessment of weight (*Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001)) and, notwithstanding his finding that Mr. Jankelow was not an acceptable medical source, he considered the 20 C.F.R. § 404.1527 factors that apply to all medical opinions.   *See Watkins v. Barnhart,* 350 F.3d 1297, 1301 (10th Cir. 2003).

Plaintiff argues that Mr. Jankelow's opinion is uncontroverted and should have been given greater weight because "[n]o other source offered a conflicting opinion." (Doc. #18 at 7).   Yet, the only other source to treat Plaintiff for mental health was Dr. Rodriguez, who completed a one-page standardized form following his only visit with Plaintiff.   Mr. Vigil appears to suggest that Mr. Jankelow's opinion should receive greater weight simply because there are no other professional findings.   However, there is no requirement in the social security regulations that the ALJ must arrive at or adopt the same conclusion as at least one medical source opinion.   *McDonald v. Astrue*, No. 10—cv—00871—CMA, 2011 WL 1398928, at *5 (D. Colo. April 13, 2011) (citing *Billups v. Barnhart,* 322 F.Supp.2d 1220, 1227 (D. Kan. 2004) (noting no requirement that the

---

[6] The ALJ noted that "euthymic" was likely the intended descriptor instead of "euphoric." (*See* (Record 11-2) at 18).

RFC assessment be linked to a medical source opinion provided the assessment is supported by substantial evidence in the record).[7]   The ALJ rejected Mr. Jankelow's opinion because he found it was not well-supported by "medically acceptable clinical and laboratory diagnostic techniques" and not consistent with the other substantial evidence.   *See* 20 C.F.R. §§ 404.1508, 404.1527(c)(2).   This satisfies the applicable legal standards.

      2.    <u>ALJ's Instruction Regarding Plaintiff's Social Restrictions and Concentration and Memory Impairments</u>

The ALJ determined that Plaintiff suffered moderate social limitations during his assessment of whether Plaintiff's mental impairments satisfied the "paragraph B" criteria used to evaluate the severity of mental impairments at steps two and three of the sequential evaluation process.   The "paragraph B" criteria are: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."   20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.00C.   The limitations identified in the "paragraph B" criteria are not an RFC assessment.   *Beasley v. Colvin*, 520 Fed. Appx. 748, 754 (10th Cir. 2013) (citing Social Security Ruling ("SSR") 96-8P, 1996 WL 374184 (S.S.A.)).   "Once an impairment is determined to be severe, it must be reflected in the RFC."   *Id.* (citing *Hargis v. Sullivan,* 945 F.2d 1482, 1488 (10th Cir.1991)).[8]   The ALJ's finding of moderate difficulties in social functioning in the

---

[7] Plaintiff analogizes the uncontroverted opinion of Mr. Jankelow to the uncontroverted opinion of Dr. Vega in *Chapo v. Astrue*, 682 F.3d 1285, 1290-91 (10th Cir. 2012).   However, the ALJ in *Chapo* dismissed Dr. Vega's examining-source opinion with the sole explanation that the doctor had been in a professional relationship with the claimant for "merely two months" at the time of the hearing.   *Id.* at 1291. In contrast, Mr. Jankelow is not an acceptable medical source.   Moreover, the ALJ provided many reasons for attributing little weight to his opinion, including that the objective medical evidence did not support the findings of marked and extreme limitations in every area of mental and emotional functioning.

[8] The ALJ determined Plaintiff exhibited only moderate difficulties with regard to social functioning because he "is able to go shopping, use public transportation, and did not endorse any problems getting

"paragraph B" criteria did not necessarily dictate a work-related functional limitation for the purposes of the RFC assessment. *Id.*   Furthermore, the ALJ considered the findings of Plaintiff's mental status exams, which showed that Plaintiff maintains normal eye contact; is always cooperative, pleasant, and polite; is appropriate, alert, and oriented; and has organized and logical thoughts.  (*See* Record (Doc. #11-11) at p. 41 of 100).  The ALJ found these results indicated that Plaintiff interacts well with certain individuals, such as those with whom he has established a rapport and is familiar, and his mental impairments should not impede his ability to interact with co-workers and supervisors.  (*See* Record (Doc. #11-2) at 18-19 of 41).

As with Plaintiff's social functioning limitations, the ALJ determined that Plaintiff exhibited moderate difficulty with regard to memory and concentration in the process of evaluating the "paragraph B" criteria.   Therefore the finding of moderate difficulty in memory and concentration did not necessarily require reflection in the RFC.   Indeed, the ALJ found that Plaintiff "retain[ed] enough memory and concentration to perform at least the simple tasks associated with unskilled labor," based on Plaintiff's own representation that he paid attention fine and followed written and oral instructions "good," along with the evidence from Plaintiff's medical reports.  (Record (Doc. #11-2) at 18 of 41; (Doc. #11-6) at 28 of 57).   Moreover, the Social Security Administration Program Operations Manual System ("POMS") instructs that a claimant's ability to concentrate is "not critical" to performing unskilled work.[9]  POMS states that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a

---

along with neighbors, friends, and family in his function report."  (*See* Record (Doc. #11-2) at 14 of 41; (Doc. #11-6) at 25-28 of 57).

[9] *See* Social Security Administration Program Operation Manual System § DI 25020.010(B)(3), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010 (last visited September 9, 2014).

sustained basis) to: (1) understand, carry out, and remember simple instructions; (2) make judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions; (3) respond appropriately to supervision, coworkers and work situations; and (4) deal with changes in a routine worksetting." *Id.* at § DI 25020.010(A)(3)(a).  A substantial loss of ability to meet these basic mental demands "severely limits the potential occupational basis and thus, would justify a finding of inability to perform other work even for persons with favorable age, education and work experience." *Id.* at § DI 25020.010(A)(3)(b).  POMS does not define "substantial loss," but the court has no reason to find that moderate limitations in memory and concentration necessarily qualifies as a complete inability to perform in the area. Accordingly, the ALJ did not err by failing to instruct the VE on Plaintiff's moderate difficulties with regard to social functioning, memory, and concentration.

## D.    ALJ's Assessment of Plaintiff's Credibility

Plaintiff objected in the Complaint to the ALJ's assessment of his credibility (doc. #1 at 2), but failed thereafter to brief the argument.  (*See* Doc. #14, 18).  Nonetheless, I will address the ALJ's assessment below.

"A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." *Thompson v. Sullivan,* 987 F.2d 1482, 1488 (10th Cir. 1993) (citations omitted).  Plaintiff met the initial burden.  He had an anterior ligament tear in his left knee that was repaired by surgery in March 2007; exam findings showed some

limitations in Plaintiff's ability to lift, carry, or engage in frequent bending, kneeling, or squatting; and Plaintiff has been observed walking with a limp.  Furthermore, Plaintiff is obese.   The ALJ found that Plaintiff's weight, while not in and of itself disabling, significantly limits his ability to perform basic work activities when combined with his other impairments.  (*See* Record (Doc. #11-2) at 16 of 41).

The ALJ was required to consider all the relevant objective and subjective evidence and "decide whether he believe[d] the claimant's assertions of severe pain," *Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir. 1987).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence...." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). "Credibility determinations are peculiarly the province of the finder of fact, [however,] and we will not upset such determinations when supported by substantial evidence." *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990).  The ALJ considered Plaintiff's testimony that he could not work due to knee and back problems; was unstable on his feet; takes medications and has attended physical therapy; has difficulty bending, lifting, and squatting; can stand for fifteen minutes; can lift twenty pounds; suffers from depression and anxiety and does not like to leave his house; and struggles with concentration.  (*See* Record (Doc. #11-2) at 16 of 41).  The ALJ then reviewed the medical evidence of and treatment received for Plaintiff's back and knee pain and the findings from Plaintiff's mental status exams and the treatment he received for depression and anxiety.  (*See* Record (Doc. #11-2) at 16-19 of 41).  He concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms"; however, the statements concerning the "intensity, persistence and limiting effects" of the symptoms were not

credible to the extent they were inconsistent with the RFC assessment.  (Record (Doc. #11-2) at 16 of 41).  For example, a September 2010 x-ray of Plaintiff's lumbar spine "revealed moderate disc space narrowing at L4-5 and mild scoliosis."  *Id.* (citing Doc. #11-9 at 40 of 47).   A January 2011 MRI of Plaintiff's lumbar spine "revealed mild diffuse osteophytes mildly encroaching on the thecal sac and mild disc desiccation at L4-5."  *Id.* (citing Doc. #11-10 at 39 of 90).  An August 2011 MRI of Plaintiff's left knee "revealed intact cruciate ligament, medial meniscus, and medial collateral ligaments." *Id.* (citing Doc. #11-11 at 35 of 100).  An MRI of Plaintiff's knee taken one month later "revealed an intact anterior cruciate ligament graft and a small amount of joint fluid." (Record (Doc. #11-2) at 17 of 41) (citing Doc. #11-11 at 29 of 100).   The ALJ determined there was no objective medical evidence of current problems with the ligaments or menisci in Plaintiff's knee; and the objective evidence pertaining to Plaintiff's lumbar spine demonstrated "only moderate disc height loss at L4-5 and mild diffuse osteophytes in the rest of the lumbar spine."  *Id.*   The ALJ concluded that, "[o]verall, these objective findings are far less extreme than the claimant's allegations would lead one to expect, and are significantly inconsistent with the claimant's allegations."  *Id.*

The ALJ similarly found that the objective evidence did not support Plaintiff's allegations regarding nervousness, reluctance to leave his house, and a limited ability to perform daily activities.  The ALJ cited mental status exams that showed Plaintiff to have normal eye contact and to always be cooperative, pleasant, and polite.  (Record (Doc. #11-2) at 18 of 41) (citing Doc. #11-11 at 41, 47, 62 of 100).  He then determined that Plaintiff's testimony of limited daily activities could not be objectively verified with

any reasonable degree of certainty, and that even if Plaintiff's activities were as limited as he alleged, it was difficult to "attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence…"[10]   The ALJ's evaluation of Plaintiff's subjective complaints is supported by substantial evidence in the record.

## CONCLUSION

The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Mr. Vigil was not disabled within the meaning of Titles II and XVI of the Social Security Act and therefore not eligible to receive Disability Insurance Benefits or Supplemental Security Income benefits. Accordingly, IT IS ORDERED that the Commissioner's final decision is AFFIRMED and this civil action is DISMISSED, with each party to bear his own fees and costs.

DATED at Denver, Colorado, this 16th day of September, 2014.

BY THE COURT:

   s/Craig B. Shaffer
United States Magistrate Judge

---

[10] Though not addressed by the ALJ, the record includes notes taken during an initial psychiatric appointment in October 2011 that Plaintiff had recently been mountain biking in an effort to increase his exercise.  (*See* Record (Doc. #11-11) at 45 of 100).